IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| KATHY STIGGERS, § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:09-CV-2350-BF |
| § | |
| MICHAEL J. ASTRUE, § | |
| Commissioner of the Social § | |
| Security Administration, § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Kathy Stiggers ("Plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. The Court has considered Plaintiff's Brief, filed May 26, 2010, Defendant's Brief, filed July 23, 2010, and Plaintiff's Reply Brief, filed August 6, 2010. The Court has reviewed the parties' evidence in connection with the pleadings and hereby orders that the Commissioner's decision be REVERSED and REMANDED for reconsideration.

### I. BACKGROUND[1]

*A. Procedural History*

Plaintiff filed applications for SSI and DIB on November 21, 2005. (Tr. 33.) The Commissioner denied her claim at the initial and reconsideration levels. (*Id.*) Following Plaintiff's timely request, Administrative Law Judge ("ALJ") Rebecca D. Westfall held a hearing on May 8,

---

[1] The following history comes from the transcript of the administrative proceedings, which is designated as "Tr."

2008 in Dallas, Texas. (*Id.*) After obtaining testimony from Plaintiff, her Lakes Regional Mental Health and Mental Retardation ("MHMR") caseworker, and the vocational expert, the ALJ issued an unfavorable decision on July 23, 2008. (Tr. 28.) Plaintiff timely filed her request for review before the Appeals Council. (Tr. 41.) She submitted a brief in support of this request, and the Appeals Council denied the request for review on October 19, 2009. (Tr. 1; 10-25.) Plaintiff filed this case on December 10, 2009, seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. §405(g). (Doc. 1.) This matter now is ripe for consideration on the merits.

### B.    *Factual History*

#### 1.    Plaintiff's Age, Education, and Work Experience

Plaintiff's date of birth is November 16, 1968. (Tr. 92.) Plaintiff has a high school education. (Tr. 452.) Plaintiff's past work includes work as a cashier, day care worker, packer, nurse aid, and housekeeper. (Tr. 40.)

#### 2.    Plaintiff's Medical Evidence

In January 2005, Stiggers reported back pain after falling. (Tr. 302.) She reported acute, radiating pain in the middle of her back and near her shoulders. (*Id.*) X-ray findings noted mild degenerative changes in her upper lumbar region. (Tr. 303.) In June, she reported lower back pain. (Tr. 281.) A lumbar spinal x-ray showed straightening consistent and paraspinous muscle spasms. (Tr. 286.) She was diagnosed with an acute lumbosacral acute myofascial strain. (Tr. 283.) In July, Stiggers stepped on a plank and hit her leg. (Tr. 268.) She was diagnosed with a left knee contusion and lower back pain. (Tr. 268-69.) In December, she described neck pain and left arm pain, along with three bouts of vomiting. (Tr. 264.) Impression was dehydration and viral acute gastroenteritis. (Tr. 257-58.) In January 2006, Stiggers reported pain in her upper back and left shoulder. (Tr. 251.)

Impression was chest pain and acute myofascial strain. (Tr. 253-54.) In February, she reported left shoulder and neck pain, numbness and swelling in her left finger tip, foot pain, and arthritis. (Tr. 312.)

In April 2006, Stiggers told the consultative examiner that she had a history of left arm and shoulder pain due to an injury caused by lifting a patient while working. (Tr. 237.) She reported difficulty moving her left arm at the shoulder, tightness in the left side of her neck, and pain through her left shoulder into her left arm and hand. (*Id.*) Stiggers reported years of pain in the middle of her back. (*Id.*) She was 5'5" and weighed 236 pounds. (*Id.*) She reported pain in her ankle when walking, and she was unable to bend over and get back up due to limited range of motion. (Tr. 238.) Her straight leg raise was negative. (*Id.*) She had generalized bilateral tenderness throughout the spine with decreased range of motion. (*Id.*) Her left shoulder was tender to palpation, and she fully guarded it, not allowing passive range of motion testing. (*Id.*) She performed left shoulder abduction to 75 degrees and elevation of 75 degrees. (*Id.*) The examiner was unable to assess the left shoulder acromioclavicular joint due to full guarding by Stiggers. (*Id.*) The examiner assessed her with generalized chronic pain syndrome, chronic back pain, and left shoulder pain. (Tr. 239.) He noted the possibility of symptom magnification and noted that she guarded fully at the shoulders. (*Id.*)

In May 2006, she went to the emergency room of the Medical Center at Terrell and reported pain in her left ribcage when lying flat on her left side. (Tr. 215.) She also reported marijuana abuse. (*Id.*) She was diagnosed with anxiety. (Tr. 212-15.) In August, Stiggers described pain and altered sensation in the forearm, wrist, and hand. (Tr. 246-47.) She reported a pain in her neck and radiating pain in her left arm and hand. (*Id.*) Impression was cervical radiculopathy, spurring, straightening, and DJD. (Tr. 223-26.) X-ray findings noted paraspinous muscle spasms, spurring of the cervical

vertebral bodies, and disc space narrowing at C4-C5 and C5-C6. (Tr. 222.) In September, she was diagnosed with plantar fasciitis, and her BMI was 39. (Tr. 202.) She also reported body aches especially in the joints, sweating at night, sleeping excessively, feeling down frequently. Impression was myalgia and depression. (Tr. 202-03.)

In November 2006, she again reported body aches and pain and was diagnosed with myalgia and myositis. (Tr. 196-97.) In December, Stiggers related persistent sinus, right top of foot, and left shoulder pain. (Tr. 193-94.) She reported fatigue, night sweats, weight increase, pigmentation and/or texture changes, watery eyes, sneezing, sinus drainage, orthopnea, waking up short of breath, requiring 3 to 4 pillows under her head, wheezing, coughing, abdominal pain, bloating, nausea, vomiting, constipation, diarrhea, depression, mood changes, difficulty concentrating, nervousness, insomnia, tension, polyphagia, polydypsea, facial/body hair change, skin striae, numbness, tremors, weakness and paralysis, headaches 3 to 4 times per week, joint pain, and thoracic joint pain and stiffness. (Tr. 377-80.) The diagnosis was hirsutism and irritable bowel syndrome. (*Id.*)

In February 2007, she related being unable to get over her flu and body aches, pain in her legs, and multiple painful spots in her toes, left knee, and hands. (Tr. 360-61.) Her left lower extremity was extremely tender to palpation. (*Id.*) The diagnosis was edema, myalgia, and myositis. (*Id.*) In March, she described pain radiating from her right hand to her left toes. (Tr. 358-59.) In July, she complained of stomach, left knee, and shoulder pain. (Tr. 355-56.) The diagnosis was myalgia, myositis, and abdominal pain. (Tr. 356.) In September, she complained of burning, aching, and cramping pain in the stomach, left knee, and shoulders. (Tr. 348.) Her cervical spine was tender to palpation, and her diagnosis was depressive disorder, myalgia, myositis, and cervicalgia. (Tr. 348-49.)

In December 2006, she started at MHMR under treatment of Dr. Hughes and reported feeling depressed and anxious with post traumatic stress disorder ("PTSD")-like symptoms. (Tr. 402.) The mental status exam noted ideas of guilt, hopelessness, and reference. (Tr. 404.) She described a long history of crack use now in remission, a brief bullemic history, and daily marijuana use. (Tr. 405.) Dr. Hughes diagnosed her with major depressive disorder vs. bipolar variant and probable PTSD. (*Id.*)

In March 2007, her diagnosis was bipolar II disorder, panic disorder with agoraphobia, cocaine dependence, and cannabis dependence, with a global assessment of functioning of 38.[2] (Tr. 398-99.) She reported no longer using cocaine but reported that she continued smoking marijuana daily to help her relax and sleep. (*Id.*) In June, Stiggers reported having marginal benefit from her medications. (Tr. 349-50.) She also reported hearing voices and racing thoughts. (*Id.*) Her affective disorder diagnosis was changed to bipolar I disorder, with the most recent episode rated severe with psychotic features. (Tr. 330.) In July, she reported hearing voices inside her head, and her symptoms were severe enough to meet mixed mania criteria. (Tr. 327.) Stiggers again reported hearing voices and racing thoughts in September and November 2007 and January 2008. (Tr. 316-17; 410; 417-18.)

After the ALJ's denial, Stiggers submitted a mental Residual Functional Capacity ("RFC") assessment, performed by Dr. Hughes, to the Appeals Council. (Tr. 431-36.) The opinion noted that Stiggers met with the physician once every two months. (Tr. 433.) Her diagnosis was bipolar I mixed, severe, with psychotic features, and a global assessment of functioning of 40. (*Id.*) Dr. Hughes noted that Stiggers has received service at MHMR since December 2006. (*Id.*) Her

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text rev. 2000) (DSM). A GAF score of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.*

symptoms consisted of difficulty sleeping, anxiety, low energy, frequent agitation, racing thoughts, and depression. (*Id.*) Her prognosis was guarded. (*Id.*) Dr. Hughes then discussed her history of cannabis dependence and cocaine dependence in remission since May 2005. (*Id.*) Her last reported cannabis abuse was in January 2008, and her last drug screen was negative. (*Id.*)

Her symptoms also included anhedonia or pervasive loss of interest in almost all activities, decreased energy, impairment in impulse control, general persistent anxiety, difficulty attending or concentrating, persistent disturbance of mood or affect, paranoid thinking or inappropriate suspicion, bipolar syndrome, hallucinations or delusion, manic syndrome, and easy distractibility. (Tr. 434.) Dr. Hughes found Stiggers unable to meet competitive work standards within a sustained basis in a regular work setting. (Tr. 435.) He opined that she could not complete complex and detail-oriented instructions or a normal workday and workweek without interruptions from psychologically-based symptoms. (*Id.*) He also found Stiggers seriously limited but not precluded in a number of other mental abilities and aptitudes needed to do unskilled work. (Tr. 435-36.) He then noted that she was unable to handle stress, has been unsuccessful at attempting to obtain employment, and has difficulty carrying out complex and detail-oriented instructions. (Tr. at 436.) He also noted that she has limited ability in relating to others and difficulty maintaining emotional stability. (*Id.*) Dr. Hughes also explained that she has chronic pain in her back, knees, and hips. (*Id.*)

   3.  Plaintiff's Hearing

At her administrative hearing, Stiggers testified to being diagnosed with recurrent gout since 2002 and having injections in both of her shoulders. (Tr. 456.) She reported having trouble lifting her hands over her head to do overhead-type work and reaching. (*Id.*) Stiggers reported pain in her feet, wrists, ankles, and lower stomach. (Tr. 466.) She testified that she has gout problems—later

clarified as plantar fasciitis—3 or 4 times per month. (Tr. 466-68.) She reported swelling and pain in both feet, making it hard to walk and causing numbness. (Tr. 468.) Stiggers also testified that she has pain in her lower back. (Tr. 469.) She reported being able to lift only 15 to 20 pounds, along with difficulties sitting or standing. (Tr. 469-70.)

Stiggers testified to depression, fatigue, anger, and panic attacks. (Tr. 463.) She reported not liking being around others when she is angry because she lashes out at them. (Tr. 463-64.) Her last employer fired her after she lashed out at her supervisor. (Tr. 464.) She also reported not getting sleep other than little naps in the daytime. (*Id.*) Stiggers also described problems thinking clearly. (*Id.*) She described how stress will not let her work for more than four hours. (Tr. 465.) She reported having to take 10 to 15 minute breaks every two hours while working due to mood changes. (*Id.*) Stiggers also testified to problems with doing things quickly enough and remembering her daily schedule. (*Id.*)

Her MHMR caseworker, Randy Dawkins, testified that he has observed her since her 2006 intake. (Tr. 473.) He reported observing crying episodes, extreme depression, and paranoid thoughts that people were watching her and were out to get her. (Tr. 474.) Mr. Dawkins said that she has difficulty remembering detail-oriented things like group therapy and doctors appointments and that she has problems with stress and adapting to changes in home, work, and social environments. (*Id.*) He opined that her medical conditions would make it difficult for her to get along with her coworkers. (Tr. 474-75.) He also explained that he thought her biggest problem would be her ability to work at a fast pace and complete her tasks in a timely manner. (Tr. 475.) While Mr. Dawkins stated he did not know whether she was still using drugs, he reported no indication she was using drugs during their meetings at the clinic and her home. (*Id.*)

The VE testified that Plaintiff has past relevant work as a cashier, housekeeper, mental health worker, nurse aid, assembler and packer, and daycare worker. (Tr. 476.) She testified that a younger individual with the same education and background as Plaintiff, who is limited to simple, routine, medium work without frequent overhead lifting or reaching and only incidental public contact, could work as a final assembler, photocopy machine operator, and document preparer. (Tr. 477.) She further testified that these jobs would allow a maximum of two absences per month. (Tr. 478.) However, a person who has occasional verbal confrontations with coworkers and supervisors, an occasional inability to complete tasks, and a twenty percent reduction in pace could not perform any jobs in the national economy. (Tr. 478.)

### C.   *ALJ's Findings*

First, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2009. (Tr. 35.) Second, she found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date. (*Id.*) Third, she found Plaintiff to have the following severe impairments: myofascial strain, left shoulder pain, obesity, bipolar disorder, panic disorder with agoraphobia, cocaine and cannabis dependence. (*Id.*) Fourth, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix I of the Regulations. (Tr. 38.) Fifth, she found that Plaintiff has the RFC to perform and sustain medium work without frequent reaching overhead. (*Id.*) She further found that Plaintiff only retains the ability to perform relatively simple, routine work with incidental public contact. (*Id.*) Sixth, the ALJ found that Plaintiff is unable to perform any past relevant work. (Tr. 40.) Seventh, she determined that Plaintiff was a younger individual on the disability onset date, has at least a high school education, and is able to communicate in English. (*Id.*) Eighth, the ALJ found

transferability of job skills not material. (*Id.*) Ninth, she found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id.*) Finally, the ALJ found that Plaintiff has not been under a disability, as defined by the Act, from January 8, 2003 through the date of the decision. (Tr. 41.)

## II. ANALYSIS

### A.     *Standard of Review*

A claimant must prove that she is disabled for purposes of the Act to be entitled to social security benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional

capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the Regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. §405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

Having reviewed the applicable legal standards, the Court now turns to the merits of the case.

## C. *Issues for Review*

Plaintiff contends that the Appeals Council failed to address the treating source assessment of Dr. Hughes with adequate specificity and that substantial evidence does not support the ALJ's

RFC determination. Defendant argues that the Appeals Council properly denied review and that the ALJ properly determined Plaintiff's RFC.

1. Appeals Council's Decision

In conjunction with her request for review by the Appeals Council, Plaintiff submitted a mental RFC assessment completed by Dr. Hughes on November 6, 2008. In that assessment, Dr. Hughes, who met with Plaintiff once every two months for nearly two years, describes in detail Plaintiff's symptoms and opines as to Plaintiff's mental abilities and aptitudes. On October 19, 2009, the Appeals Council denied review, stating that "we considered the reasons you disagree with the decision and the additional evidence. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 5-7.) Plaintiff argues that the Appeals Council failed to properly address the new evidence submitted on appeal as required by the Hearings, Appeals and Law Litigation Manual ("HALLEX"). HALLEX provides that the Appeals Council must "specifically address additional evidence or legal arguments or contentions submitted in connection with the request for review." HALLEX § I-3-5-1 (Sept. 8, 2005). However, Defendant contends that an Agency policy statement from July 1995 suspended HALLEX's requirement for "detailed discussion of additional evidence and for specific responses to contentions in denial notices." *See* I-3-5-90 Exhibit, 2001 WL 34096367 (Jul. 20, 1995).

The Regulations provide a claimant the opportunity to submit new and material evidence to the Appeals Council for consideration when deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R § 404.970(b). Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering that final

decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Higginbotham*, 163 F.App'x at 281-82.

Additionally, the Fifth Circuit has held that violations of HALLEX constitute grounds for remand where prejudice results. *See Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)). Although HALLEX does not carry the authority of law, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous that otherwise would be required." *See Hall*, 660 F.2d at 119.

Defendant correctly points out that in July 1995, the Office of Appellate Operations issued a policy statement "temporarily" suspending the Appeals Council's obligation to provide detailed responses to submissions of new evidence. *See* I-3-5-90 Exhibit, 2001 WL 34096367. However, it is unclear whether this policy statement is still in effect. Westlaw shows it was last updated on September 3, 2005. *See id.* Additionally, some courts have recognized the policy statement, while others have not. *Compare Bellard v. Astrue*, No. 09-1603, 2011 WL 13847, at *3-4 (W.D. La. Jan. 3, 2011) (finding that the Appeals Council violated HALLEX by failing to specifically address the additional evidence), *and Speights v. Barnhart*, No. 04-003-D-M3, 2004 WL 3331910, at *8-9 (M.D. La. Nov. 30, 2004) (noting the existence of the agency memorandum but ultimately remanding the case because the Appeals Council failed to comply with HALLEX), *with Davis v. Astrue*, No. 3:10-CV-958-P-BH, 2011 WL 444776, at *10 (N.D. Tex. Jan. 7, 2011) ("the requirement has been temporarily suspended by a memorandum"), *and Lee v. Astrue*, No.

3:10-CV-155-BH, 2010 WL 3001904, at *8 (N.D. Tex. Jul. 31, 2010) ("the requirement has been temporarily suspended by a memorandum"). In *Newton v. Apfel*, the Fifth Circuit, without discussing the policy statement, found that the Appeals Council erred by violating the relevant provision of HALLEX. *See Newton*, 209 F.3d at 459.

The Court is unable to discern from the record presented whether or not the duty of explanation as set forth in section I-3-5-1 of HALLEX is operational or under suspension. However, the Court finds that determination of this issue is not key to resolution of the case. Even if the Appeals Council was not required to specifically address the new evidence, the Court must still determine whether substantial evidence supports the Commissioner's decision. Looking at the record as a whole, the Court finds that the additional evidence dilutes the record to such an extent that the ALJ's decision is insufficiently supported.

At the hearing, Plaintiff's caseworker testified that she has difficulty remembering detail-oriented things and getting along with her coworkers. Additionally, he reported that Plaintiff would have trouble working at a fast pace and completing tasks in a timely manner. The VE testified that these limitations would prevent Plaintiff from working. However, the ALJ did not include these limitations in Plaintiff's RFC. In making this determination, he found the testimony of the caseworker to be not credible because the caseworker testified that he had not witnessed Plaintiff's drug use or seen any evidence of her drug use. The ALJ noted that Plaintiff testified to using drugs during this time period. The ALJ concluded that the caseworker must not have read or been familiar with Plaintiff's case file and, therefore, had no basis for his opinions.

If the ALJ's decision was initially supported by substantial evidence, the addition of Dr. Hughes' assessment to the records makes the decision insufficiently supported. Contrary to

Defendant's argument, Dr. Hughes' opinions are inconsistent with the ALJ's RFC determination. The additional evidence states that Plaintiff is unable to perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, deal with normal work stress, or maintain socially appropriate behavior.(Tr. 435-36.) The ALJ, in rejecting the caseworker's testimony, chose not to include these limitations in Plaintiff's RFC.

Although the records from MHMR assigned low GAF scores and noted difficulties with social and occupational functioning, they did not provide a detailed assessment of Plaintiff's inability to work. Dr. Hughes' mental RFC questionnaire, on the other hand, is very detailed and addresses various aspects of her physical, social, and mental functioning. It not only identifies her limitations, but specifically points out that Plaintiff's impairments, symptoms, and treatment would cause her to be absent from work three days per month.[3] (Doc. 16-1.) It also states that chronic pain related to her mental disorder would incapacitate her more than might be anticipated from objective findings alone. (Tr. 436.) Furthermore, the opinion comes from Plaintiff's treating source and is entitled to controlling weight absent good cause. *See* 20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456. The ALJ provided no reason that Plaintiff's treating source should be given diminished significance. Since the Appeals Council did not specifically address this evidence or any other conflicting evidence in the record, the case is remanded to the Commissioner for reconsideration. "Conflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

### III. CONCLUSION

---

[3] The Court notes that the last page of Dr. Hughes' mental RFC assessment has been omitted from the administrative record.

Because this Court finds that the additional evidence submitted by Plaintiff to the Appeals Council dilutes the record to the point that the Commissioner's determination is no longer supported by substantial evidence, the Court orders that the case be REVERSED and REMANDED for reconsideration.

SO ORDERED, March 23, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE